OPINION
This is a reopened appeal by defendant-appellant, Thomas G. Moody, from his September 30, 1998 judgment of conviction for murder and felonious assault. Appellant and his brother, Ronald Moody, were indicted on charges of murder with a firearm specification, in violation of R.C.2903.02, felonious assault with a firearm specification in violation of R.C. 2903.11, and having a weapon while under disability, in violation of R.C. 2923.13. A joint trial against appellant and his brother began on September 10, 1998. Ronald Moody entered into a plea agreement after the first witness testified, and the trial continued against appellant. On September 22, 1998, the jury found appellant guilty of murder, felonious assault, and the firearm specifications. A nolle prosequi was entered on the weapon under disability count. Appellant was sentenced to a term of fifteen years to life for murder plus a three-year firearm specification to be served consecutively to the murder count and eight years for felonious assault, to be served concurrently.
On October 23, 1998, appellant filed his notice of appeal raising three assignments of error. This court affirmed the judgment of conviction in a memorandum decision rendered on September 30, 1999. State v. Moody
(Sept. 30, 1999), Franklin App. No. 98AP-1371, unreported. On December 29, 1999, appellant filed an application to reopen, which was granted by this court on February 22, 2000.
The charges arose out of events that occurred on November 11, 1997. Several witnesses testified that Sylvester Harrington, III, and Paul Holder, a.k.a. John Williams, were on S. 22nd Street and stopped Ronald Moody to inquire about his puppy. Sylvester believed the puppy was his puppy. Eventually, the discussion escalated into a fistfight between Ronald and Sylvester and between appellant and Paul. Ronald pulled a knife and the fights ended. Sylvester and Paul retreated to 672 S. 22nd Street where Paul's aunt lived. Ronald drove away, and appellant went to his home at 700 S. 22nd Street. During these fights, LaMarr Newbern was on his porch at 685 S. 22nd Street with friends, Rip, Khadaffi Johnson and another unidentified person. Three eyewitnesses and appellant testified that Ronald returned to the neighborhood on foot and walked around the block. Appellant testified that, upon his return to the house, Ronald handed him a gun, and appellant placed it in his pants. (Tr. Vol. IV, at 175.) Appellant was standing on his porch, and Ronald was in the front yard of 700 S. 22nd Street. LaMarr Newbern's brother, Zachariah Brown, testified that, at this time, he, Newbern, Khadaffi Johnson, Rip, Thomas, and Baby Girl were in the front yard of 685 S. 22nd Street. Brown testified that he, Newbern and Johnson left to meet his sister at the bus stop and were walking south on S. 22nd Street towards Livingston Avenue. Thomas, Rip and Baby Girl started walking north on S. 22nd Street towards Newton. Paul Holder testified that Newbern first walked to 672 S. 22nd Street to ask if Holder was okay after the fight concerning the puppy. Then Newbern and the others walked towards 700 S. 22nd Street. Brown testified that Ronald made a "little smart comment" to them and that Newbern and Johnson stopped. (Tr. Vol. III, at 141.) Words were exchanged, and Johnson started to take off his coat. Ronald pulled out his gun, and appellant then pulled out his gun. Newbern was shot in the chest, and Johnson was shot in the head. The evidence as to who shot Newbern and who shot Johnson is conflicting. Judith Johnson testified that both brothers were aiming and firing deliberately into the group gathered in front of the house. Brown testified that appellant shot Johnson and that Ronald shot Newbern. Paul Holder testified that he saw Ronald shoot both Johnson first and then Newbern. (Tr. Vol. IV, at 133.) Holder testified that he did not see appellant shoot at all. (Tr. Vol. IV, at 152.) Appellant confessed to police that he shot both victims. (Tr. Vol. IV, at 183.) At trial, appellant testified that he confessed in an attempt to keep his brother from going back to prison. Appellant also testified that Ronald shot Johnson after Johnson made a move that looked as if he were pulling out a gun and that Ronald then walked up to Newbern and shot him.
Appellant admitted he fired his gun but stated he only did so after Johnson and Newbern had been shot, and only to scare the others to make them run. He testified that he did not shoot anyone and did not intend to shoot anyone. He stated that his bullets were fired above everyone because he was standing on an elevated porch approximately nine feet above the street. Appellant then tossed his gun to his brother who took off running. Appellant remained on his porch and surrendered to the police.
Johnson died at Children's Hospital on November 17, 1997. The guns were never recovered. The deputy coroner's testimony was that Newbern's wound did not appear to have a downward trajectory, and Johnson's wound had a "very slight" drop, not what one would expect if the victim were standing upright and someone were shooting from a nine foot elevation. (Tr. Vol. III, at 127.)
In his reopened appeal, appellant has asserted nine assignments of error as follows:[1]
 [I.] The prosecutor improperly exercised a peremptory challenge to remove An African-American juror.
 [II.] Appellant received ineffective assistance of counsel by virtue of trial counsel's failure to make the jury questionnaires a part of the record.
 [III.] The court erroneously instructed the jury that appellant could be found guilty as an aider and abettor.
 [IV.] The court's instructions on aiding and abetting were legally insufficient, permitting conviction of appellant as a complicitor without directing the jury's attention to all the elements of complicity.
 [V.] The trial court erroneously refused to incorporate instructions on self-defense into the instructions on complicity.
 [VI.] The court improperly responded to a question from the jury without the defendant or counsel being present, denying appellant his right to be present and his Sixth Amendment right to counsel at a critical stage of proceedings.
 [VII.] Appellant was denied a fundamentally fair trial, due process of law, the right to confrontation and effective assistance of trial counsel when, following the departure of the codefendant and his counsel in midtrial, no jury instructions were given directing the jury that they could not consider this change in circumstances in any manner.
 [VIII.] Prosecutorial misconduct and misstatement of the law and testimony during closing arguments denied appellant a fair trial.
 [IX.] The cumulative effect of the errors advanced herein, combined with the ineffective assistance of former appellate counsel, entitles appellant to a new trial.
In his first assignment of error, appellant argues he is entitled to a new trial pursuant to Batson v. Kentucky (1986), 476 U.S. 79,106 S.Ct. 1712, because the prosecution exercised a peremptory challenge against an African American juror because of his race. We disagree.
In Batson, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution precludes purposeful discrimination by the state in the selection of peremptory challenges to exclude members of minority groups from jury service. Batson has since been extended to criminal defendants who are not of the same race as the excluded jurors, Powers v. Ohio
(1991), 111 S.Ct. 1364; civil cases, Edmonson v. Leesville Concrete Co.
(1991), 500 U.S. 614, 111 S.Ct. 2077; defense peremptory challenges,Georgia v. McCollum (1992), 505 U.S. 42, 112 S.Ct. 2348; and gender based peremptory challenges, J.E.B. v. Alabama ex rel. T.B. (1994), 511 U.S. 127,114 S.Ct. 1419. The burden of proof is on the defendant to show that the state has used a peremptory challenge in a discriminatory manner.Batson, supra, at 96 S.Ct. 1723.
The Supreme Court has articulated a three-part process for proving such violations. First, the opponent of the peremptory challenge must establish a prima facie case of racial discrimination. Second, the burden of production then shifts to the proponent of the strike to come forward with a race-neutral explanation. Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.Purkett v. Elem (1995), 115 S.Ct. 1769, 1770-1771. The Ohio Supreme Court has stated that:
 Trial judges must exercise considerable care in reviewing a claim of racial discrimination in jury selection. A judge should make clear, on the record, that he or she understands and has applied the precise Batson test when racial discrimination has been alleged in opposition to a peremptory challenge. [Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 99.]
Here, the trial court was not called upon to make a specific finding as to whether appellant had made a prima facie showing of racial discrimination because the prosecutor immediately offered a justification for his decision. The prosecutor stated:
Mr. Jakubow: I would ask Mr. Trimble be excused.
 Mr. Luther: We ask the state to state a race neutral decision for excusing Mr. Trimble, who is the only African-American on the panel.
 Mr. Jakubow: That's incorrect. If you look in the back there, there is Mr. Humphrey.
 Mr. Luther: Pardon me. But Mr. Trimble is an African-American, the defendants are African-American. I did not see anything about Mr. Trimble's answers that would indicate that he could not be fair and impartial. I would ask the prosecution to state their reasons for exercising that.
Mr. Shroyer: I would join in that.
 Mr. Jakubow: There were certain answers to my questions that, for lack for a better word, didn't set, which he's probably the only one on the panel who is unemployed, that is basically his employment is a concern, being a stake in the system, as it were.
 The Court: I don't have the benefit of a copy of the questionnaires.
Bailiff Waldrop: Here's one.
 Mr. Luther: I don't think that is sufficient reason for excusing an African-American on this case where the defendants are African-American.
 Mr. Jakubow: I don't think it goes into whether or not the defendants are African-American or not. It is whether or not I'm depriving him of his opportunity to sit on the jury for a racially-motivated reason. That is the standard.
 The Court: Your basis is that because he's currently unemployed, and this indicates he's an unemployed surveyor, that his wife and three daughters — wife and one daughter are employed at the moment, and he has a younger daughter.
 Mr. Jakubow: There was some answers also to my questions, and I have to ask the reporter to read back the discussion I had with him specifically to give you a good reason. If that need be, maybe we can do that tomorrow.
The Court: Did race factor in your decision?
Mr. Jakubow: No, it did not.
 The Court: Very well. I will allow the challenge. [Tr. Vol. I, at 216-218.]
The issue of whether appellant has established a prima facie case is moot. Once the prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot. Hernandez v.New York (1991), 500 U.S. 352, 359.
The prosecutor's proffered explanation in this case, that he struck Mr. Trimble because he was unemployed, is race-neutral. The prosecutor also indicated that Mr. Trimble's answers to some other questions "didn't set." During voir dire, Mr. Trimble indicated that he had a relative who had been a victim of a violent crime:
Mr. Jakubow: Okay. Mr. Trimble, who is that you knew?
A Juror: My brother.
 Mr. Jakubow: Was there anything as a result of that, is there any reason why you wouldn't want to sit on this case?
A Juror: No, I don't have any problems with that.
 Mr. Jakubow: Okay. What happened to him? Did they find out what happened to him as far as they find the people who committed the crime?
A Juror:
No. [Tr. Vol. I, 112.]
In evaluating the prosecutor's race-neutral reasons for using a peremptory challenge, the reviewing court must give the findings of the trial court great deference, since those findings rest largely upon the court's evaluation of the prosecutor's credibility. Batson, supra,476 U.S. at 98. The Ohio Supreme Court has held that a trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. State v. Hernandez (1992), 63 Ohio St.3d 577, 583. While self-serving comments by the prosecutor that he was not racially motivated are not sufficient to satisfy the burden of the state to demonstrate a race-neutral basis for its peremptory challenge, Batson,supra, the representations of the prosecutor in the present case that other criteria governed his decision apparently satisfied the trial court that the prosecution's proffered explanation was credible. The trial court's determination that appellant did not meet his burden of establishing a racially motivated challenge is not clearly erroneous. The first assignment of error is not well-taken.
In his second assignment of error, appellant contends that he was deprived of his right to effective assistance of counsel according to the standards set forth in Strickland v. Washington (1984), 466 U.S. 668. In particular, appellant contends that his counsel was ineffective for failing to make the jury questionnaires part of the record.
In order to prevail on his claim of ineffective assistance of counsel under Strickland, appellant must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds (1998), 80 Ohio St.3d 670,674. "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland, supra, at 686. Thus, a two-part test is necessary to examine such claims. First, appellant must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. State v. Keith (1997), 79 Ohio St.3d 514,534. Second, appellant must show that, but for counsel's errors, there is a reasonable probability that the results of the trial would be different. Id.
The burden of showing ineffective assistance of counsel is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558 ("[j]udicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel"); State v. Carpenter (1996),116 Ohio App.3d 615, 626 (court of appeals is to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). Applying these standards, we find that appellant has failed to show that his counsel was ineffective. The content of the jury questionnaires is unknown. As such, whether those questionnaires would have been of any aid whatsoever to appellant in his Batson challenge is purely speculative based on the trial record before us. The second assignment of error is not well-taken.
In his third assignment of error, appellant argues the trial court erred in instructing the jury that appellant could be found guilty as an aider and abettor. Appellant contends that the evidence could only have supported the conclusion that appellant was guilty as a principal or an accessory after the fact, but the evidence was insufficient to support an instruction on aiding and abetting.
An instruction on aiding and abetting was appropriate if, after viewing the evidence in the light most favorable to the prosecution, any rational juror could have found the elements of the crime proven beyond a reasonable doubt. R.C. 2923.03(A) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense" and R.C. 2923.03(F) provides that an aider or abettor "shall be prosecuted and punished as if he were a principal offender." "Thus, an aider and abettor to murder must assist the principal with the `purpose' of causing death, because purpose is the mens rea for murder." State v. Mendoza (2000),137 Ohio App.3d 336, 343. "In other words, an intent to kill is insufficient; there must also be an intent to assist the principal offender to kill." Id., quoting 3 Katz Giannelli, Criminal Law (1996) 233, Section 92.3.
Mere association with the principal is insufficient to constitute the offense of aiding and abetting. State v. Sims (1983), 10 Ohio App.3d 56,58, citing State v. Clifton (1972), 32 Ohio App.2d 284. To aid is to assist. To abet is to incite or encourage. Sims, supra, at 58. The accused must take some role in causing the commission of the offense. "Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act." Id. at 59, quoting Smith v. State (1931),41 Ohio App. 64, 67-68; see, also, State v. Stepp (1997),117 Ohio App.3d 561, 568. "Without previous connection with the transaction, one is not an aider or abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object." Sims, at 59, quoting Smith, at 68. Criminal intent can be inferred from an accused's presence, companionship, and conduct both before and after an offense. State v. Pruett (1971), 28 Ohio App.2d 29, at 34.
In this case, the state's theory was that both brothers acted in concert firing their weapons simultaneously into the group gathered in front of their house. The prosecutor argued that, even if none of appellant's shots actually hit the victims, appellant, by virtue of firing into the crowd, was aiding his brother in committing murder and felonious assault.
The state's witnesses had different versions of the shooting. Lamarr Newbern testified at a hearing on a motion to suppress and gave a confused and conflicting account of what transpired when he was shot. Newbern essentially admitted that he was not telling the truth at the hearing and was not called as a witness at trial.
Judith Johnson was the mother of Sylvester Harrington, III, who was involved in the fight over the puppy. Johnson observed the events unfold in front of 700 So. 22nd Street from her house at 680 So. 22nd Street and made a series of calls to 9-1-1. Johnson testified that she saw Lamarr Newbern open his jacket "like he was going to fight" and then the shooting began. (Tr. Vol. II, at 96.) Johnson testified that both brothers were shooting at the same time, carefully aiming and firing at the group in front of them. (Tr. Vol. II, at 169-171, 173, 177.) Johnson stated that she did not actually see guns in the brothers' hands, but, rather, heard shots and saw puffs of smoke coming from both brothers' hands. (Tr. Vol. II, at 97-99.)
Zachariah Brown testified that appellant was standing on his porch and a second man [Ronald] was on the lower steps. (Tr. Vol. III, at 142-143.) Brown testified that the second man pulled his gun and shot Newbern in the chest. (Tr. Vol. III, at 147, 187). A few seconds later, appellant produced a gun and began firing, hitting Khadaffi Johnson as Johnson was running away. (Tr. Vol. III, at 147-149, 156-157, 190, 195.) Brown testified that he told police detectives at the time that he saw appellant shoot Johnson. (Tr. Vol. III, at 189.) Detective William Gillette, who interviewed Brown after the shooting, contradicted this testimony. Gillette testified that at no time did Brown tell him that he saw appellant shoot Johnson. (Tr. Vol. IV, at 33.) Brown also failed to identify either appellant or his brother from a photo array, and he testified that he falsely identified another person in a photo array because he was upset. (Tr. Vol. III, at 155.)
Appellant testified that his brother shot Khadaffi Johnson while Khadaffi "made a move that looked to [appellant] like [Khadaffi] was pulling a gun." (Tr. Vo. IV, at 179.) After that, according to appellant "[e]verything stopped, everybody, everything stopped. And my brother walked down the steps and walked directly up to Newbern and shot Newbern, and Newbern fell halfway down and caught himself and got up and ran." (Tr. Vol. IV, at 180.) Appellant claimed that after his brother had shot the two victims, his brother was trying to shoot more people. (Tr. Vol. IV, at 181.) Only then, according to appellant, did appellant fire all the rounds in his gun hoping to scare off the group before his brother shot more people. (Tr. Vol. IV, at 180-181, 202-203.)
Paul Holder, a.k.a. John Williams, was a friend of the victims and also involved in the fight over the puppy. He was called as a witness by the defense. Holder testified that he saw Ronald first shoot Johnson and then shoot Newbern. (Tr. Vol. IV, at 133.) Holder testified that he did not see appellant shoot at all. (Tr. Vol. IV, at 152.)
As discussed in our original decision concerning the sufficiency of the evidence, if we construe the evidence in a light most favorable to the prosecution, a rational trier of fact could have found appellant guilty of felonious assault and murder either as a principal offender or under a theory of aiding and abetting. Under a theory of aiding and abetting, the jury could have inferred criminal intent to assist his brother in killing Johnson and causing serious harm to Newbern from appellant's conduct before, during, and after the shooting. Appellant accepted the gun given to him by his brother Ronald. According to Judith Johnson, appellant aimed and deliberately fired his gun into the group of youths gathered in front of his house. Whether any of the bullets from appellant's gun actually struck the victims was a question of fact turning largely on the credibility of Zachariah Brown. If the jury believed Johnson and Brown, appellant took an active role in the offenses and did not merely acquiesce or witness the shooting of the victims. If the jury found Judith Johnson to be a credible witness, appellant's deliberate act of aiming and firing his gun into the group of youths was an overt act intended to assist his brother. If the jury believed Zachariah Brown's testimony that appellant actually shot Khadaffi Johnson as he was running away, then appellant could have been found guilty as a principal offender on the murder count. Thus, it was appropriate for the trial court to instruct the jury under both theories. The third assignment of error is not well-taken.
Having determined that the trial court did not err in instructing the jury on aiding and abetting, we next must determine whether the instructions, as given, were erroneous. Appellant, in his fourth assignment of error, argues that the trial court failed to instruct the jury over his objection that an aider and abettor must share the same culpable mental state applicable to the principal offender. (Tr. Vol. V, at 10-12.) Appellant also objected to the failure of the trial court to give an instruction that failure to stop a person from committing a crime does not constitute aiding and abetting. (Tr. Vol. V, at 13.) Appellant further argues that the jury should have been instructed that mere presence does not amount to aiding and abetting.
The trial court first instructed the jury as to the elements of murder. (Tr. Vol. V, at 94.) The trial court then instructed the jury on aiding and abetting as follows:
 Alternatively, you may find the defendant guilty of aiding and abetting on the commission of the offense of murder. To aid is to help, assist or strengthen. To abet is to encourage, counsel, incite or assist. Before you can find the defendant guilty of aiding and abetting, you must unanimously find beyond a reasonable doubt that on or about the 11th day of November, 1997, and in Franklin County, Ohio, that the defendant, Thomas G. Moody, purposely aided or abetted another in committing the offense of murder. [Tr. Vol. V, at 95.]
Nearly identical language was used to instruct the jury on aiding and abetting in relation to the offense of felonious assault with the culpable mental element changed from "purposely" to "knowingly." (Tr. Vol. V, at 98.)
A reviewing court will not reverse a conviction in a criminal case due to jury instructions unless it is found that the jury instructions amount to prejudicial error. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph two of the syllabus. Jury instructions should outline the issues, state the applicable principles of law, and clarify the jury's role in the case. Bahm v. Pittsburgh Lake Erie Rd. Co. (1966),6 Ohio St.2d 192. A jury instruction is proper when it adequately informs the jury of the law. Linden v. Bates Truck Lines, Inc. (1982),4 Ohio App.3d 178.
The trial court has the responsibility to give all jury instructions that are relevant and necessary for the jury to weigh the evidence and make findings of fact. See State v. Comen (1990), 50 Ohio St.3d 206, paragraph two of the syllabus; State v. Lessin (1993), 67 Ohio St.3d 487. The court is not required, however, to give requested instructions verbatim, so long as the instructions actually given contain a correct, pertinent statement of the law and are appropriate to the facts of the case. Id. When reviewing a specific challenged instruction on appeal, the instruction should not be judged in isolation; rather, it must be viewed in the context of the overall charge. State v. Price (1979),60 Ohio St.2d 136, paragraph four of the syllabus.
In this case, the trial court's instructions on aiding and abetting were taken directly from 4 Ohio Jury Instructions, Section 523.03. The instructions provided that appellant must purposely or knowingly aid and abet another in the commission of the principal offense. Under some circumstances, instructing the jury that a defendant must knowingly or purposely assist another to commit the underlying offense sufficiently explains that the defendant must act with the same culpability as the principal offender. For example, in State v. Twinam (Dec. 2, 1986), Franklin App. No 86AP-341, unreported, this court concluded that, if the conduct attributed to the defendant (planning a burglary, encouraging juveniles to commit the burglary, and providing lunch meat to distract the victims' dogs) actually occurred, it was consistent only with the purpose to engage in a theft. Therefore, even though the trial court incorrectly charged the jury on the subject of complicity, the failure to instruct on the proper mental state did not rise to the level of plain error.
However, when a defendant's behavior could have been consistent with lower levels of culpability, it is error for the trial court to fail to instruct the jury that a necessary element for convicting a person of complicity is the same mental culpability required for the commission of the offense. State v. Hurd (May 4, 1999), Franklin App. No. 96AP-326, unreported; State v. Cummings (Apr. 21, 1992), Franklin App. No. 90AP-1144, unreported. In Cummings, this court stated: "[t]he elements of an offense must be expressly and explicitly defined in the charge. It is not sufficient that the jury may speculate from the charge that, in addition to the elements defined in the charge, an additional element is necessary for a conviction." Id. at 1594.
In this case, while the jury could have found the requisite intent, they were not required to find intent. Appellant admitted to purposely firing his weapon, but he claimed that he did so only after his brother had shot the two victims. Appellant denied that he shared his brother's alleged murderous intent. Rather, appellant testified that he fired his weapon to scare the youths off before his brother caused further harm. Had the jury been instructed that appellant had to share the same culpable mental state as his brother, with respect to the principal offense, appellant could have been acquitted if the jury chose to believe that he purposely fired his weapon for the purpose of scaring the youths off, not for the purpose of causing death or serious physical harm. Alternatively, the jury could have inferred purpose to kill or cause serious physical harm from Judith Johnson's testimony that appellant carefully aimed and fired into the group on the street.
Under the instructions as given, however, the jury could have found appellant guilty of aiding and abetting murder and felonious assault without making a finding as to an essential element of the offense. The jury could have concluded that appellant was guilty as an aider and abettor because he purposely fired his weapon regardless of whether it found he had the requisite intent to kill or cause serious physical harm. The defense specifically requested an instruction that made clear that appellant had to share the same purpose as the principal offender with respect to the underlying offense. The trial court's failure to give such an instruction was prejudicial error as it went to the heart of appellant's defense.
That this was prejudicial error may also be inferred from the question that came from the jury during deliberations. The record shows that, at some point in their deliberations, the jury considered rejecting the theory that appellant was a principal offender and had some confusion as to the instructions on aiding and abetting. Before returning guilty verdicts, the jury inquired of the court "'[c]ould we find the defendant not guilty of murder/felonious assault, yet find him guilty of aiding and abetting murder/felonious assault?'" (Tr. Vol. V, at 107.) The trial court answered this inquiry by reiterating that aiding and abetting was an alternative means of committing the principal offense. Id. The fourth assignment of error is sustained.
In the fifth assignment of error, appellant argues the trial court should have incorporated instructions on self-defense into the instructions on complicity. Appellant argued at trial that the jury should have been instructed that, if Ronald Moody acted in self-defense, appellant could not be guilty of aiding and abetting because the affirmative defense of self-defense would extend to appellant as an alleged aider and abettor. The trial court refused to give an instruction on self-defense believing that it only related to Ronald Moody, and Ronald Moody was no longer on trial. (Tr. Vol. V, at 6.)
In State v. Hill (1994), 70 Ohio St.3d 25, a landlord gave permission for a tenant to grow marijuana for the tenant's personal use. Under the drug statutes in effect at that time, possession of a large quantity of marijuana was treated as trafficking regardless of any intent to sell. But personal use was an affirmative defense. In Hill, the Ohio Supreme Court held that the landlord was entitled to an instruction on the affirmative defense as it related to the landlord's alleged complicity in drug trafficking. The Supreme Court stated:
 It is obvious that appellant did not assert a "personal use" defense regarding his possible consumption of the drug. Rather, appellant attempted to demonstrate that he acquiesced in Newbauer's original intent allowing Newbauer to grow marijuana for Newbauer's personal use. The state's argument, if followed to its extreme, would allow a defendant who has been charged with aiding and abetting to be prosecuted for assisting a principal in an act which the principal is privileged to do. This would be comparable to allowing a defendant to be convicted for aiding and abetting without proof that a principal offense was committed. We have held that although the state need not establish the principal's identity, it must, at the very least, prove that a principal committed the offense. State v. Perryman
(1976), 49 Ohio St.2d 14, 3 O.O.3d 8, 358 N.E.2d 1040, paragraph four of the syllabus. [(Emphasis sic); Hill, supra, at 28, fn. omitted.]
The reasoning in Hill clearly extends to the circumstances in the present case, at least insofar as it relates to the shooting of Khadaffi Johnson. Appellant and his brother had fought earlier with two young men over ownership of a puppy. A group of the young men's friends and associates then confronted appellant and his brother in front of appellant's house. Appellant testified that, after some words were exchanged, Johnson made a move as if he were reaching for a weapon, and appellant's brother shot in response. This was evidence from which the jury could have concluded that Ronald Moody was in fear of death or great bodily harm and acted in self-defense. If the jury believed this testimony, such a defense would be a complete defense, and appellant could not be convicted of aiding and abetting with respect to the first victim.
Appellant's own testimony, however, defeats any self-defense instruction with respect to the second victim. Appellant testified that, after Johnson was shot, everyone froze. Appellant's brother then walked up to within three or four feet of the unarmed Newbern and shot him in the chest. The fifth assignment of error is, therefore, sustained with respect to the charge of murder, as the jury should have been instructed on self-defense as it related to the shooting of the first victim, but overruled as to the charge of felonious assault.
Given our disposition of the fourth and fifth assignments of error, the remaining assignments of error are rendered moot. The judgment of the Franklin County Court of Common Pleas is reversed and the matter is remanded for a new trial.
BOWMAN and DESHLER, JJ., concur.
 ____________ LAZARUS, J.
[1] Appellant numbered his assignments of error four through twelve. We have renumbered them here as assignments of error one through nine for ease of discussion.